FREDERICK H. HOWELL and Others, Copartners, Doing Business
under the Firm Name of B. H. HOWELL, SON & COMPANY,
Respondents, *v.* GARRETT & COMPANY, INCORPORATED, Appellant.

Second Department, November 5, 1926.

Sales — action by seller for breach by buyer of contract for sale of sugar
— Statute of Frauds — contract stated specific price and provided for
credit voucher in case estimated charges proved less than expected —
contention by plaintiffs that paper was contract and not memorandum
and, therefore, Statute of Frauds does not apply is not sustained — if con-
tract does not fix price it is unenforceable under Statute of Frauds —
contract fixes price definitely — provision as to credit voucher constitutes
separate contract — plaintiffs not bound by statement in amended com-
plaint subsequently stricken out construing price provision — tender and
refusal was shown by proof that plaintiffs repeatedly asked for shipping
instructions — sugar was purchased at request of Federal government
— plaintiffs were not agents of government — act of United States
Sugar Equalization Board in adjusting losses did not affect plaintiffs'
right to sue — plaintiffs were real parties in interest — evidence — not
error to refuse to admit evidence by defendant to explain last sentence
of price clause — construction of that sentence was matter of law
for court.

This action was brought to recover damages for breach of a contract by the
defendant to purchase sugar from the plaintiffs. The contract provided for
the shipment of sugar from Argentine, F. O. B., New York city. Although
repeatedly requested to do so, the defendant on the arrival of the sugar failed
to give shipping directions and upon notice that unless shipping directions
were given the plaintiffs would resort to legal action, the defendant still
refrained from accepting the sugar. The provision in the contract in reference
to the price was as follows: " At Twenty-one and 30/100 (21.30c) Cents per
pound, less 2%, duty paid, F. O. B. New York City, net landed weights. Should
various estimated charges used in arriving at the above price prove less than
expected, credit voucher for the difference will be rendered the buyer." The
contention by the plaintiffs that the action was not brought upon an oral
contract of which a memorandum in writing had been signed by the parties
but that the action was upon a written contract and, therefore, the Statute of
Frauds has no application, cannot be sustained, for in either case, whether the
action be based on a memorandum or upon a written contract, the instrument
must contain all of the essentials of a contract and if a written contract does
not fix the price it is unenforceable under the Statute of Frauds.

The price clause quoted contains a definite agreement as to the price to be paid
for the sugar and the last sentence thereof constituted a separate contract to
the effect that in case various estimated charges used in arriving at the definitely
stated price proved less than expected, a credit voucher would be rendered to
the buyer. Said provision cannot be construed as a provision for the reduction
of the price so as to make the price of the sugar indefinite and the contract void
for that reason.

The plaintiffs are not bound by an allegation in their amended complaint in which
they construe the provision as to price as providing for a reduction of the price

stated, since it appears that that allegation in the complaint was stricken out by the trial court on an application to renew a motion previously made, which motion the trial judge had the power to grant and, therefore, under the circumstances, the construction of the contract was open and the court had the power to construe it as alleged in the pleadings.

The contention by the defendant that the construction by the court to the effect that the price clause contained a separate and independent agreement for a credit voucher was contrary to the evidence on the theory that the clause stricken from the complaint constituted an admission, cannot be sustained for that clause did not contain any statement of facts but merely the pleader's construction of the contract.

The fact that the provision for a credit voucher did not show definitely the amount of credit to be allowed is immaterial in this case, since the action is not brought upon that clause.

Since it is held that the provisions as to price and a credit voucher constitute independent contracts, the fact that the provision relating to credit may not be enforcible does not affect the entire provision.

The evidence establishes that a proper tender of the sugar was made to the defendant, for it appears that upon the arrival of the sugar in New York the plaintiffs asked for shipping directions; that the defendant took samples but made no complaint as to the quality or the condition of the sugar and consistently refused or failed to give shipping directions to the plaintiffs, and since it further appears that by the terms of the contract the purchase was against sight draft with bill of lading attached or delivery order for the amount of the invoices and that the sugar was sold F. O. B., New York city net landed weight.

The contention by the defendant that the title to the sugar in question was vested in the United States government and not in the plaintiffs cannot be sustained, for while it appears that the sugar was purchased at the request of the United States government and under the direction of Federal agents for the purpose of distribution in such a manner as to reduce the high price of the sugar, the action of the United States Sugar Equalization Board acting under authority of Congress to take over, liquidate and adjust the transaction in question, did not constitute a taking over of the sugar by the United States government, for the report of that body was distinctly to the effect that the plaintiffs should retain the claim in question against the defendant for about one-third of the amount claimed, and the Board and the plaintiffs stipulated that in case the plaintiffs should recover more than the amount allowed, the excess should be paid to the Board or to the Treasury of the United States. Throughout the entire negotiations between the plaintiffs and the United States Sugar Equalization Board, the claims were not treated by the Board as the property of the United States government, but as the property of the plaintiffs, and, therefore, the plaintiffs were the real parties in interest and were authorized to maintain this action.

It was not error for the court to exclude testimony as to the meaning of the provision in the price clause relating to a credit voucher, for the meaning of that provision was for the court to determine as a matter of law.

APPEAL by the defendant, Garrett & Company, Incorporated, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Suffolk on the 22d day of July, 1925, upon the verdict of a jury rendered by

direction of the court, and also from an order entered in said clerk's office on the 11th day of July, 1925, denying defendant's motion for a new trial made upon the minutes.

*Hiram C. Todd* [*Harold J. Faulkner* and *William U. Goodbody* with him on the brief], for the appellant.

*Joseph W. Murphy* [*Lorenzo D. Armstrong* and *John S. Keith* with him on the brief], for the respondents.

JAYCOX, J. The action was brought to recover damages for breach of contract. The plaintiffs entered into a written contract with the defendant for the sale of 7,500 bags of Argentine granulated sugar, each bag containing about 150 pounds of sugar, at twenty-one and three-tenths cents a pound, less two per cent thereof, F. O. B. New York city; shipments of sugar to be made by steamers from the Argentine Republic — during July, 1920, 2,500 bags; during August, 1920, 2,500 bags; and during September, 1920, 2,500 bags. If shipments were prevented upon the dates mentioned, the buyers were to accept delivery when made.

The proofs show that the plaintiffs purchased in the Argentine, in time for shipment according to the sales contract, something over 13,000 tons of sugar; that shipments of this sugar were made from Argentine to the plaintiffs in New York; that notice of the arrival of the sugar was given to the defendant and a request made for directions as to where the defendant desired the sugar to be delivered. The defendant gave no shipping directions, but delayed action and never actually accepted or refused the sugar. The matter continued in that way until at last, in January, 1921, the plaintiffs gave the defendant notice that the sugar must be accepted on or before February third, otherwise plaintiffs would resort to legal action. The sugar was not accepted. The plaintiffs proved the market price of the sugar on February 3, 1921, and the verdict directed is for the difference between the contract price and the market price on that date.

The complaint, in addition to the usual facts presented in a complaint upon a breach of contract, contained other facts, to which I will later refer. The answer contained some denials and then set up three separate defenses; the *first* of which was, in effect, that the claim upon which this action was brought belonged to the United States government; *second*, that the plaintiffs were not the real parties in interest, and *third*, the Statute of Frauds. (See Pers. Prop. Law, § 85, as added by Laws of 1911, chap. 571.) The latter defense is made the subject of the appellant's first point.

The contract involved is printed as an exhibit annexed to the complaint. It contains all the essential elements of a contract,

unless by its terms the price of the sugar is not stated in the contract. The clause in relation to this reads as follows:

" At Twenty-one and 30/100 (21.30c) Cents per pound, less 2%, duty paid, F. O. B. New York City, net landed weights.

" Should various estimated charges used in arriving at the above price prove less than expected, credit voucher for the difference will be rendered the buyer."

It is the contention of the appellant that the price of the sugar was not fixed and determined by this clause, but was left open as a matter of future computation. The contention of the respondents is, mainly, that this action was not brought upon an oral contract, of which a memorandum in writing had been signed by the parties, but that the action was upon a written contract and, therefore, the Statute of Frauds has no application. This contention, in my estimation, is entirely erroneous. The character of a document cannot be changed by applying a name to it, and by calling this a contract the plaintiffs cannot make it a legal contract if it lacks any essential element to constitute a legal contract. The only difference, as I understand it, between an action brought upon an oral contract, of which a memorandum in writing has been signed, and one brought upon a written contract is, that where the action is brought upon an oral contract evidence of the contract, in addition to the memorandum, may be given; while if the action is brought upon a written contract the contract in writing cannot be helped out or elaborated by the oral negotiations. In either case, however, the written document must contain all the essentials of a contract. Therefore, in this case, if the written contract does not contain a provision fixing the price, the contract is not enforceable under the Statute of Frauds. In this situation no evidence of the understanding of the parties can be given. The only oral evidence admissible is evidence to place the court in the same situation as the parties were at the time the contract was made, so as to enable the court to construe the contract as made. This was the position taken by the trial court and all evidence as to the understanding of the parties excluded. At the time of the trial the judge announced his views during colloquies with counsel and by directing a verdict in favor of the plaintiffs. A motion was entertained to set aside the verdict; the judge received briefs and denied the motion, with an opinion in which he said: " The contract contains two independent enforcible provisions; one is for the sale of goods to which the statute is applicable, and which meets all the requirements thereof; the other a promise of plaintiffs to give defendant a credit voucher under certain conditions subsequent, the terms of which are not all stated in detail, but as to which, however, the statute has no

application. If the contract had provided that the price was to be lessened by the difference between ' estimated charges ' and actual charges, the situation would be different. But that is not the case. The price is fixed and unchangeable at 21.30 cents per pound, less two per cent duty paid. Upon the happening of the contingency (without deciding the effect of a breach by defendant), an obligation arises from plaintiffs to defendant which has no bearing on the price. The ultimate result in dollars, if both obligations of this contract were met, would be the same as if the price were reduced, but the methods are legally different. If the price were reduced on the happening of the contingency, then defendant's obligation would be to pay 21.30 cents per pound, less two per cent duty paid, less the difference between ' estimated charges ' and the actual charges. But here defendant has obligated itself to pay the price named. Then upon the happening of the contingency plaintiffs are required to give a credit voucher for the difference. The latter obligation is not a contract for the sale of goods."

I agree with the conclusion reached and the reasoning by which it was reached.

The parties have cited many cases, but none of them are in point. This point must be disposed of by determining whether the plaintiffs agreed to reduce the price or whether they agreed to give the defendant a credit voucher, which should be applicable to future dealings between the parties. The authorities cited by the appellant all bear upon the question of the necessity of the price being fixed in the contract. There can be no controversy about this question. It has been decided too many times. The only question in this case is, was the price contingent upon certain expenditures which the plaintiffs were to make, or was there a separate agreement by the plaintiffs to give the defendant a credit voucher applicable to future business dealings between them? In my estimation the contract, in so far as the price is concerned, is the same as if the defendant had agreed to pay twenty-one cents for the sugar and then had added a provision that if it sold the sugar for a lower price than had been discussed in their negotiations it would be entitled to a credit voucher, equal to the decrease in price. Under such a contract I think the price at which the goods were sold would be a fixed price, binding upon both parties. If later the goods were sold at a lower price than was anticipated, the seller would be entitled to credit for the amount. In this case I think the plaintiffs are entitled to maintain their action for a breach of the contract, and the defendant is entitled to a credit voucher for the amount which the " estimated charges " exceeded the actual expenses.

The appellant urges that the plaintiffs are bound by their pleading, to the effect that the clause in the memorandum referred to the price. The 5th paragraph of the complaint reads as follows:

"*Fifth.* That the said agreement in writing contained the following paragraph, to wit: 'Should various estimated charges used in arriving at the above price (*i. e.* 21.30 cents a pound) prove less than expected, credit voucher for the difference will be rendered the buyer.' That it was the purpose and intent of the said paragraph that the purchase price of the said seven thousand five hundred bags of sugar specified in the said agreement in writing should be the actual total cost of the said sugar, including all expenses, duty, disbursements and obligations incurred in connection with purchasing the said sugar and bringing it to New York City and making shipment and distribution thereof to the defendant, plus one cent a pound to compensate or repay the plaintiffs, and one cent a pound to compensate or repay the American Trading Company, a Maine corporation, for their respective time, trouble and services rendered in purchasing and bringing the said sugar to New York City and in selling and distributing the same.

"Upon information and belief, that the said actual total cost of the said sugar, including all expenses, duty, disbursements and obligations incurred, as later ascertained and determined, was less than the estimated amount thereof at the time of the execution of the said agreement in writing by the defendant and the plaintiffs, so that pursuant to the provisions of the said agreement in writing the defendant became entitled to a credit as against the said specified purchase price of twenty-one and 30/100 cents (21.30c) a pound, of 1.36 cents a pound; that is to say, the agreed purchase price of the said sugar specified in the said agreement in writing, as calculated and ascertained pursuant to the said paragraph, was reduced to the sum of 19.94 cents a pound F. O. B. New York City, net landed weights, which said sum thereupon became and was the agreed purchase price of the said sugar specified in the said agreement in writing."

The plaintiffs, several months after the service of the amended complaint containing this provision, moved at Special Term for leave to serve a further amended complaint. The motion was denied. The motion papers, the opposing affidavits and the opinion and order were introduced in evidence. The purpose of the motion was to omit from the complaint the allegations by which it was alleged that the price was subject to change by reason of the decrease in the expenses incident to the purchase and shipment of the sugar. The opinion of the court shows that the court held

the paper writing sufficient as a contract, even though it provided for a reduction in price. At the opening of the trial the motion was renewed to strike this provision from the complaint, and the position of the court then was that he would allow it to remain in the complaint, as it might be an admission of some kind in favor of defendant, but that it had nothing to do with the construction of the contract. Later, the court granted leave to renew the motion. Eventually the motion was granted and the court permitted the pleading to stand merely as an admission. The appellant claims that, by this allegation in the complaint and the defendant's admission of it, the law of the case had been made and that the law so made was binding upon the court and the parties to the action. He cites a number of cases to that effect. The cases cited, however, in my estimation, have no application to the situation here presented. Upon the trial the plaintiffs saw that the construction placed upon the contract in the complaint was erroneous and sought to withdraw that allegation. This was opposed by the defendant and the motion denied. Upon the trial the plaintiffs asked leave to renew; leave was granted; the motion was renewed and granted. Therefore, the complaint no longer contained any allegations construing the contract and there was nothing to which the defendant's admissions in that respect could apply. I do not understand that it can be seriously contended that the court did not have the power, especially when the motion for leave to renew the motion was made before the same judge who heard the original motion. Upon the renewal of such a motion the court had the same power that it had upon the original motion. Therefore, the court determined the action upon the pleadings, in which no construction was placed on this clause of the contract by the plaintiffs, and the law of the case was not made by their pleadings. The construction of the contract was open and the court had the power to construe it.

The appellant further claims that the pleadings were before the court and were evidence in the case, and that the construction placed upon the contract was contrary to the evidence. If the provision in the complaint had contained facts which were in favor of the defendant and no evidence to the contrary had been introduced, the appellant's contention would be right. The provision in question, however, contained no facts; merely the pleader's construction of the contract. With this provision stricken from the complaint no question of fact arose. The court was called upon to construe the contract. The construction, of course, related to a question of law and not of fact. Therefore, the appellant's contention in that regard is not well founded.

The appellant next claims that the meaning of this clause cannot be ascertained from the memorandum itself and that the credit to be allowed the defendant must be clearly set forth. I do not agree with this contention. The price was fixed and the credit was a matter for the future. The defendant, no doubt, would have a cause of action upon this clause against the plaintiffs, and in that action could compel the proof of all the expenditures made by the plaintiffs. If, however, we hold with the trial justice in his construction of the contract, *i. e.*, that the price was fixed and the provision in relation to the credit voucher a separate agreement, then it is immaterial whether this provision was set forth with sufficient detail or not.

The appellant contends that the provisions of the agreement are not separable, and he cites cases to show that, if a part of one entire contract is unenforceable under the Statute of Frauds, then that the whole contract is unenforceable; that a party should not be permitted to separate the parts of an entire contract and recover on one part, the other being unenforceable. The error in this reasoning is that it assumes all of the provisions of this writing to relate to one contract. The trial court construed the writing as containing two contracts; one to pay a fixed price for the sugar and the other an agreement to give the credit voucher depending upon subsequent events. When the argument assumes this to be one contract, it begs the question. The question is, was it one contract? If it was one contract the argument of appellant is applicable, but if the agreement contained two contracts the contract sued upon is undoubtedly valid and the argument does not apply.

The appellant claims that plaintiffs failed to establish a cause of action, since they neither pleaded nor proved (a) that they tendered the sugar to defendant, or (b) that a tender was either excused by circumstances or waived by defendant and that they were ready and able to perform. The proofs in the case, as I have stated, showed the purchase of a quantity of sugar much greater than necessary to comply with the contract in question. This sugar was shipped to the plaintiffs in New York. The plaintiffs gave notice of its arrival and asked shipping directions. The proof further shows that the plaintiffs, during this time, had in their possession a quantity of sugar very much greater than was necessary to fulfill the contract. The defendant took samples of the sugar; never made any complaint as to its quality or condition. It, however, gave no shipping directions to the plaintiffs. The rule is well settled that a vendor of property cannot put the vendee in default and recover for a breach of the contract without tendering delivery, alleging and proving it. (*British Aluminium*

*Co.* v. *Trefts*, 163 App. Div. 184, 188.) The character of the tender, however, depends upon the character and quantity of the goods. The contract gave the terms as " Sight Draft against bill of lading or delivery order, for invoice amount." These terms are to be construed in connection with the provision of the contract fixing the price " F. O. B. New York City, net landed weights." Before the arrival of the sugar the plaintiffs notified the defendant of its anticipated arrival and requested shipping directions; none were given. Again after its arrival similar requests were made, but no directions given. This, I think, constituted a sufficient tender.

The next point urged by the appellant is, that the title to any claim against the defendant is vested in the United States government and not in the plaintiffs. The contention of the appellant in this respect is that the plaintiffs and the American Trading Company were acting in this transaction as agents of the United States government. It is alleged in the complaint that the plaintiffs and the American Trading Company purchased 13,902 tons of sugar, of which the sugar sold to defendant formed a part, " at the request and under the direction and as agents of the Department of Justice and the Department of State of the United States Government." That this sugar was distributed under the direction of the same departments and as agents therefor by the plaintiffs " for the purpose of reducing the high price of sugar." The complaint then alleges that Congress passed a joint resolution directing the United States Sugar Equalization Board " to take over, liquidate and adjust the transaction involving the purchase of the said Argentine granulated sugar in such manner as it may deem equitable and proper." A copy of the resolution is annexed to the complaint and marked " Exhibit B." (See 42 U. S. Stat. at Large, 1224, chap. 67.) The complaint then continues : that the United States Sugar Equalization Board did take over, liquidate and adjust the transaction, and did, by an instrument in writing duly executed, duly release, transfer and set over to said American Trading Company and to the plaintiffs any claims, rights of action or demands which it had, or might have, against the defendant by reason of the foregoing. The contention of the appellant is that the United States Sugar Equalization Board was an agency of the United States government (*Federal Sugar Refining Co.* v. *U. S. Sugar Equalization Board, Inc.*, 268 Fed. 575; *De Ronde & Co.* v. *U. S. Sugar Equalization Board, Inc.*, 299 id. 659), and that being an agency of the government the Sugar Board was an agent with delegated powers and the sole source of such powers was the United States Constitution or an act of Congress. The defendant claims that there were no such powers granted to the United States

Equalization Board by the United States Constitution or an act of Congress and that, therefore, it had no power to assign this claim. (*The Floyd Acceptances,* 7 Wall. [U. S.] 666.)    There is in evidence no appointment of the plaintiffs and the American Trading Company as agents of the United States government.    There is no evidence of any contract made by it in which the United States government purchased any sugar.    The respondents quote from 2 Corpus Juris (p. 421): " The most characteristic feature of an agent's employment, in a legal sense, is that he is employed primarily to bring about business relations between his principal and third persons, and this power is perhaps the most distinctive mark of the agent as contrasted with others, not agents, who act in representative capacities."    I think that the United States, through the Department of Justice and the Department of State, induced the plaintiffs and the American Trading Company to purchase a large quantity of sugar for the purpose of distribution in the United States and to thus reduce the high price of sugar.'  I do not think that in these transactions the plaintiffs and the American Trading Company were acting as agents in the legal sense of that term.    The word " agent " has many meanings other than legal agency.    (See Century and Webster's Dictionaries.)    The plaintiffs were an instrumentality used to produce a result desired by the government.

The history of this transaction, so far as I am able to gather it from the briefs and the case itself on appeal, is as follows:  Congress passed an act August 10, 1917, known as the Food Control Act of 1917 or the Lever Act (40 U. S. Stat. at Large, 276, chap. 53), which authorized (§ 2) the President to enter into voluntary arrangements or agreements, to create and use any agency or agencies, to accept the services of any person, without compensation, to co-operate with any agency or person, to utilize any department or agency of the government, and to co-ordinate their activities so as to avoid any preventable loss or duplication of efforts or funds.    This very act, I think, indicates that relations should be established between the government and private persons, or corporations, other than that of a legal agency. The President was authorized to co-operate with any agency or person.    In this instance, the relation was a co-operation between the Departments of Justice and State with the plaintiffs and the American Trading Company, and not their appointment as agents in the legal sense of that term.    Under this act, apparently, the United States Sugar Equalization Board was incorporated.    The capital of this company was owned and controlled by the United States government.    It was incorporated in July, 1918.    (See, also, 41 U. S. Stat. at Large, 386, chap. 33.)    It had no immediate connection with the purchase of the sugar.    The sugar was purchased by the

plaintiffs and the American Trading Company between May 13, 1920, and May 22, 1920. The sale to defendant was made July 2, 1920. The joint resolution, above referred to and quoted, was passed February 9, 1923. It will be observed that this resolution, itself, indicates that this was not a transaction of the United States government. The joint resolution of Congress authorizes the President to require the United States Sugar Equalization Board, Inc., to " take over " this transaction. If this had been a transaction of the government there would have been no occasion to " take it over." The agents would have been removed or deprived of further control of it and the government would have gone on and closed it out. After taking over the transaction the United States Sugar Equalization Board is required to dispose of the sugar imported under the direction and as agents of the Department of Justice and Department of State; " to dispose of any of said sugar so imported remaining undisposed of, and to liquidate and adjust the entire transaction in such manner as may be deemed by said board to be equitable and proper in the premises, paying to the corporation and copartnership aforesaid such sums as may be found by said board to represent the actual loss sustained by them, or either of them, in said transaction." (42 U. S. Stat. at Large, 1224, chap. 67.) This language, it seems to me, is inappropriate if the plaintiffs and the American Trading Company were the agents of the government. If agents, they would have been required to account and then the Equalization Board would have been directed to pay the amount due them. There would have been no question of loss involved, because, as agents, they would not have been entitled to profit or subjected to a loss. The government would reimburse them for expenditures made by them. Neither is the language, " to liquidate and adjust the entire transaction in such manner as may be deemed by said board to be equitable and proper in the premises," appropriate for a settlement with an agent. All the government would have done, if any agency existed, would have been to repay the amounts the agent had expended over and above his receipts. The action taken by the Equalization Board was to have the American Trading Company and the plaintiffs submit their claim with substantiating documents. This was done; then the Board had accountants examine the claim and make reports. After their reports had been submitted they were required to make supplemental examinations. Then the Equalization Board reported to the President, and this report contains the following: " B. H. Howell, Son & Co., has uncollected, on defaulted contracts for the sale of sugar covered by the transactions, claims amounting to $444,318.56. It was the desire of B. H. Howell, Son & Co. that the Board take over these uncollected claims, but the Board was reluctant to enter into

litigation for their collection, and after a careful investigation into the value of these claims the Board has agreed with B. H. Howell, Son & Co. that they shall retain these claims at a value of $154,800, less estimated legal expenses in connection therewith of $25,000, it being a part of this agreement that if B. H. Howell, Son & Co. collect on these claims in excess of $154,800 that such excess will be paid over to the Board, or the Treasury of the United States. The Board in its adjustment of the loss has therefore charged American Trading Company and B. H. Howell, Son & Co. with $154,800 as the estimated value of these uncollected claims. Inasmuch as the Board has doubts that anything in excess of $154,800 will be realized on these claims the Board recommend that the Executive Order providing for the payment of the loss sustained be drawn on the basis of this estimated value, and to rely on the agreement between the Board and B. H. Howell, Son & Co. for the payment to the Board, or to the Treasury, of anything in excess of the estimated value that may be collected." It will be noted that these claims are not treated by the Board as the property of the United States government. They are the uncollected claims of B. H. Howell, Son & Co., and they are also to retain these claims. However, notwithstanding that these were the uncollected claims of B. H. Howell, Son & Co., and they were also to retain them, a release was signed by the United States Sugar Equalization Board, by which the United States Sugar Equalization Board did release, transfer and set over unto the plaintiffs and the American Trading Company all of the uncollected claims. The appellant claims that the United States Sugar Equalization Board was without power to do this. My first answer to this is, that nothing was assigned. This is one of the precautions common to lawyers, when a transaction has been entirely closed, of giving a release and assigning all claim of title to property, the title to which is clearly and legally in the party to whom the release and assignment are made. Nothing passed by the assignment. It was an entirely unnecessary step, and the title in the plaintiffs would have been just as good without it. The second answer to the contention is, that under the joint resolution of Congress the United States Sugar Equalization Board was authorized to take over this transaction and " to liquidate and adjust the entire transaction in such manner as may be deemed by said board to be equitable and proper in the premises." This, I think, authorized the United States Sugar Equalization Board to take any steps necessary to liquidate and adjust the transaction in such manner as they deemed equitable and proper. This gave to the Equalization Board broad powers. It could take any step necessary to an equitable and

proper adjustment of the matter. These transactions had been conducted entirely in the names of the plaintiffs and the American Trading Company. The purchases, I think, were all made in the name of the American Trading Company. The sales were all made by B. H. Howell, Son & Co. The report shows that the claims uncollected were all in the name of B. H. Howell, Son & Co. The Board was to pay the losses of these parties. In estimating their losses it was proper that the value of the uncollected claims be fixed and determined. This the Board did, and did decide that it would be equitable and proper, in their adjustment of the matter, that B. H. Howell, Son & Co. should retain these claims at the value fixed therefor. I am, therefore, of the opinion that the title to the claims was vested in B. H. Howell, Son & Co., and they were authorized to bring this action to collect the same.

The second defense, that the plaintiffs were not the real parties in interest, of course, depends upon the same facts and is disposed of by the same reasoning.

The fourth point urged is, that the trial court erred in excluding the testimony of the witness Von Glatz. Von Glatz was the broker through whom all the negotiations were carried on. The defendant sought, by this witness, to prove conversations he had with the plaintiffs and with the defendant as to the clause in the written memorandum, " should various estimated charges," etc., but the trial court refused, over defendant's exceptions, to receive such testimony, unless it was limited to the meaning of the words " credit voucher." There is no question about the correctness of the court's ruling in that respect. The meaning of this clause was a question of law for the court's determination. The negotiations of the parties were superseded by writing. Either party to the transaction had the right to give evidence showing the situation of the parties, so as to enable the court to stand in their places when construing the contract. This is for the purpose of enabling the court to determine from the language used in the contract what the parties meant. What they previously said has no bearing upon this question, as what they previously said is not the contract which they made. No claim is made that any mistake was made in drafting the contract; therefore, what they intended is of no consequence. It was the court's province to determine the meaning of what they wrote.

I recommend that the judgment and order be affirmed, with costs.

Present — KELLY, P. J., RICH, JAYCOX, MANNING and KAPPER, JJ.

Judgment and order unanimously affirmed, with costs.